IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

SARAH FISHER,

      Plaintiff,

v.

COLORADO SPRINGS ORTHOPAEDIC GROUP, PLLP, a Colorado Professional Limited
Liability Partnership; and COLORADO SPRINGS ORTHOPAEDIC GROUP, LLC, a Colorado
Limited Liability Company d/b/a COLORADO SPRINGS ORTHOPAEDIC GROUP d/b/a
CSOG,

      Defendants.

---

## COMPLAINT AND JURY DEMAND

      Plaintiff, Sarah Fisher, by and through undersigned counsel, Stinar & Zendejas, PLLC,

brings this action against Defendants Colorado Springs Orthopaedic Group, PLLP, a Colorado

Professional Limited Liability Partnership; and Colorado Springs Orthopaedic Group, LLC, a

Colorado Limited Liability Company d/b/a Colorado Springs Orthopaedic Group d/b/a CSOG

(herein "Defendants") as follows:

### I. INTRODUCTION

      1.    Plaintiff is a former employee for Defendants, who after successfully working for

Defendants as their Human Resources Manager/Director was abruptly terminated on August 27,

2019.

      2.    According to Defendants, Plaintiff was terminated, without herself ever receiving

any prior write-up or notice, for issuing an employee a first written warning on August 23, 2019

for that employee's absenteeism, tardiness, and poor job performance.

3.      In their CCRD response, Defendants refused to acknowledge Plaintiff's complaints and protected activities raised in the months preceding Defendants' unlawful termination, including, *inter alia*, Plaintiff's refusal and opposition to Defendants' demand that she only hire younger workers because older workers were perceived by Defendants as costing too much (pay and insurance) and being less productive and less willing to work unpaid excessive hours.

4.      Defendants' stated reason for Plaintiff's termination was pretext for discrimination and retaliation based on Plaintiff's refusal to engage in Defendants' age discrimination against older job candidates and complaints about workplace compliance and safety, as well as her own age, disability, and need for FMLA leave.  This lawsuit has been brought to address Defendants' wrongful actions against Plaintiff.

## II. JURISDICTION

5.      This action is brought pursuant this Court's federal question jurisdiction, 28 U.S.C. § 1331, to bring claims against Defendant under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.* (hereafter "ADEA"), Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* (hereafter "ADA"), and the ADA Amendments Act of 2008, Pub.L. No. 110–325 § 2(b)(1), 122 Stat. 3553–3554 (2008) (hereafter "ADAAA"); and the Family and Medical Leave Act (hereafter "FMLA"), 29 U.S.C. § 2601, *et seq.*, as interpreted by 29 C.F.R. § 825, *et seq.*, for interference with Plaintiff's rights under the FMLA, including her right to notice as set forth in the statute and the regulations.

6.      Plaintiff also invokes this Court's supplemental jurisdiction to bring claims against Defendant under the Colorado Anti-Discrimination Act C.R.S. § 24-34-402 (hereafter

"CADA"), which prohibits direct or associational discrimination, retaliation, and harassment on the basis of age and disability or perceived disability by employers with one or more employees, or complaining about such discrimination, retaliation, and harassment.

7.      Jurisdiction is proper in the U.S. district court for the District of Colorado pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332, 42 U.S.C. § 12117, and 29 U.S.C. § 2617(a)(2). The district court has original jurisdiction by virtue of the claims arising under the ADEA, ADA, ADAAA, and FMLA claims.  Further, the district court has supplemental jurisdiction over Plaintiff's state law claims, if any, pursuant to 28 U.S.C. § 1367.

### III. VENUE

8.      Venue is proper in the district of Colorado pursuant to 28 U.S.C. § 1391(b)(2) as the actions giving rise to this action occurred in the state of Colorado. The parties reside in El Paso County, Colorado and as such venue is appropriate in the district court located in Colorado Springs, Colorado.

### IV. PARTIES

9.      Plaintiff Sarah Fisher ("Plaintiff") is an individual residing in El Paso County, Colorado, who was over the age of 40 at her termination, disabled, or perceived to be disabled.

10.     Defendant Colorado Springs Orthopaedic Group, PLLP, is a Colorado Professional Limited Liability Company, with its principle office in El Paso County, Colorado, and which at all relevant times operated locations in El Paso County, Colorado.

11.      Colorado Springs Orthopaedic Group, LLC, is a Colorado Limited Liability Company, with its principle office in El Paso County, Colorado, and which at all relevant times operated locations in El Paso County, Colorado.

12.     "Colorado Springs Orthopaedic Group" is a Trade Name registered in the State of Colorado Secretary of State by a "DAVID FOSTER ROBERT LABOSKY", or some iteration thereof, who represents to be a physician operating a Colorado Springs Orthopaedic Group location presently at 4110 Briargate Parkway, Suite 300, Colorado Springs, CO 80920. According to Internet searches, including www.csog.net (the website for Colorado Springs Orthopaedic Group), 4110 Briargate Parkway, Suite 300, Colorado Springs, CO 80920 purports to be the "North Campus" location of Colorado Springs Orthopaedic Group.

13.     Plaintiff reserves the right following discovery on these entities and especially the business of "Colorado Springs Orthopaedic Group" to name Colorado Springs Orthopaedic Group as an individual defendant in this matter.

14.     Upon information and belief, Defendants Colorado Springs Orthopaedic Group and Colorado Springs Orthopaedic Group, LLC operate regularly under the trade names or aliases or doing business as "Colorado Springs Orthopaedic Group" and/or "CSOG."

15.      "Defendants" herein refers to all named defendants and their trade names, doing business as names, and aliases.

16.     Upon information and belief, and at all relevant times, Defendants employed more than 50 employees during 20 or more workweeks in the relevant calendar years.

**Defendants as Joint / Dual Employers of Plaintiff**

17.     As pled herein and upon information and belief, at all relevant times, Defendants were joint employers of Plaintiff.  Defendants shared or co-determined matters governing the essential terms and conditions of Plaintiff's employment.  Defendants directed, controlled, or maintained the right to control and supervise the administrative, managerial, and employment

duties of Plaintiff.  To the extent necessary, Defendants, or any of them, held authority, direction, and control over other Defendants, which served as agents of such principal Defendants and workers, like Plaintiff, in the operation of their facilities.  In addition, Defendants, in their capacity as principal and/or master(s) of their agent(s), is/are joint employers of Plaintiff and are directly and/or vicariously responsible for each other's acts. In addition, at all relevant times Plaintiff regularly performed work for each of these Defendants, without distinction, which affected each Defendants' management of human resources at their facilities.

18.     "[A] plaintiff who is the employee of one entity may seek to hold another entity liable by claiming that the two entities are joint employers. This joint-employer test acknowledges that the two entities are separate, but looks to whether they co-determine the essential terms and conditions of employment." *Bristol v. Bd. of Cty. Comm'rs of Cty. of Clear Creek*, 312 F.3d 1213, 1218 (10th Cir. 2002).  Further, "a plaintiff who is the employee of one entity may seek to hold another entity liable by arguing that the two entities effectively constitute a single employer." *Id*.  The concept of joint employment should be "defined expansively." *Chao v. A-One Med. Svcs., Inc.*, 346 F.3d 908, 917 (9th Cir. 2003).

### Defendants are Alter Egos of Each Other / Joint and Several Liability

19.     Plaintiff is informed and believes and thereon alleges that Defendants are and at all relevant times were alter egos of each other or may otherwise be treated as not just dual employers of Plaintiff, but also alter egos of each other and one-in-the-same, and as such being jointly and severally liable for their actions against Plaintiff.

20.     Plaintiff is informed and believes and thereon alleges, that at all relevant times to this action there was a unity of ownership and interest by and between Defendants, such that any separateness between them has never existed.

21.     Plaintiff is informed and believes and, on that basis, alleges that at all relevant times to this action each of the Defendants controlled, dominated, managed and operated each other of the Defendants for their owners' sole benefit.

22.     Plaintiff is informed and believes and thereon alleges that at all relevant times to this action there exists such a unity of interest and ownership between the Defendants that the individuality and separateness of Defendants has ceased to exist.  The business affairs of Defendants are, and at all times relevant herein were, so mixed and intermingled that the same cannot reasonably be segregated, and the same are in inextricable confusion.  Each of the Defendants, and at all times relevant herein was, used by each of the other Defendants as a mere shell and conduit for the conduct of certain of the other Defendants' affairs.

23.     For example, upon information and belief, Defendants commingled their key business assets and liabilities, including but not limited to their executives, managers, employees, benefits, corporate office space, accounting, debts, management, marketing, finances, and inventory.

24.     Throughout Plaintiff's employment with Defendants, each of the Defendants held positions of power, control, and authority over Plaintiff in the workplace.

25.     Throughout Plaintiff's employment with Defendants, each of the Defendants paid and/or contributed to payment of Plaintiff's compensation, as well as directed, controlled, and

maintained the right to control and supervise the administrative, managerial, and employment duties of Plaintiff.

26.     Throughout Plaintiff's employment with Defendants, each of the Defendants directed, controlled, and maintained the right to control and supervise the administrative, managerial, and employment duties of Plaintiff. Upon information and belief, throughout Plaintiff's employment, each of the Defendants could and did provide meaningful input into Plaintiff's receipt of benefits, as well as her specific and overall performance. Throughout Plaintiff's employment, each of the Defendants could and did have meaningful input into any decision to promote, retain, or terminate Plaintiff.

27.     Throughout Plaintiff's employment with Defendants, Defendants would provide meaningful feedback and input into Plaintiff's performance and treated Plaintiff as their own employee.

28.     At all relevant times and for all practical purposes, Defendants, and all of them, were Plaintiff's onsite supervisor.

29.     At all relevant times, Plaintiff had no choice but to follow or execute upon any of Defendants' orders, direction, or instruction without risk of termination, suspension, or other disciplinary action by Defendants against her.

30.     The recognition of the separate existence of each of the Defendants would not promote justice, in that it would permit Defendants to insulate themselves from liability to Plaintiff, and other creditors and employees who have claims against them.  Accordingly, Defendants constitute the alter ego of each other, and the fiction of their separate existence must be disregarded.

## V. EXHAUSTION OF ADMINISTRATIVE REMEDIES

31.     On July 14, 2020, the Colorado Civil Rights Division  ("CCRD") mailed, and Plaintiff subsequently received, a "Notice of Right to Sue" for CCRD Charge No. E2000006772 against Defendants (*see* **Exhibit 1**), resulting from a Plaintiff's Charge of Discrimination, which pleaded actual and/or abetting discrimination, retaliation, and harassment on the basis of age, disability and/or medical condition (actual or perceived), engaging in protected activity (e.g. complaining about age discrimination, workplace compliance, and seeking FMLA leave).  This Notice entitles Plaintiff to initiate this action within 90 days of receipt of said notice.

32.     Plaintiff has satisfied all private, administrative, and judicial prerequisites necessary for this action.

## VI. GENERAL ALLEGATIONS

A.  <u>PLAINTIFF BEGINS HER EMPLOYMENT</u>.

33.     Beginning around February 2, 2018, Defendants hired Plaintiff, who had approximately 20 years in the industry, as a Human Resources Manager, paying her $65,000 per year plus benefits.  Although Plaintiff's salary was below market, Nicole Banning, Defendants' CEO, told Plaintiff she would revisit Plaintiff's compensation during her 1-year review.

34.     Plaintiff's duties as Human Resources Manager and then as the Human Resources Director (in name) included, but were not limited to overseeing and issuing employee discipline and terminations, hiring, employee relations, employee investigations, administrative investigations, developing and maintaining workplace processes including addressing safety issues, creating and maintaining ADA and FMLA policies, processing unemployment claims, auditing systems and processes, etc.

35.     In her roles, Plaintiff invariably learned information concerning that of personal and confidential nature – it literally came with the job.

36.     At all times during her employment with Defendants, Plaintiff satisfactorily completed her job duties.

37.     On May 2, 2018, Plaintiff received her 90-day review, which ranked her as "exceptional" in all categories listed, and her salary was raised $2,000 to $67,000 per year.

38.     On February 2, 2019, Plaintiff received her first performance review, which rated her, on a scale of 1 through 5, of:

- 4.3 - "Service, Teamwork, Excellence, and Professionalism"
- 4.6 – "Commitment to Total Quality Management"
- 4.2 – "Interpersonal Skills and Cooperative Efforts"
- 4.0 – "Communication Skills and Positive Workplace Efforts"
- 4.5 – "Flexibility, Dependability, and Responsibility"
- 4.6 – "Operational Effectiveness"
- 4.1 – "Leadership"

39.     This resulted in an apparent "Overall Score" of 4.3.  Attached to the performance review was a list of 17 strengths (including "Great asset to CSOG" and "Trustworthy, dependable, great team player") and 4 areas for improvement (including "Capture all sides of story first" and "maintain a high level of confidentiality").

40.     Commensurate with Plaintiff's performance review, Defendants increased Plaintiff's salary to $74,430 plus benefits, which included PTO, phone, health insurance, dental insurance, vision insurance, and life insurance, which is approximately valued at 20% of Plaintiff's pay, or $573 every two weeks, bringing Plaintiff's approximate bi-weekly (every two weeks) compensation to $3,436. This was the approximate amount of compensation Plaintiff earned at the time of her termination in August 2019.

9

41.     In late February 2019, having received such a glowing review, working for over a year for Defendants, believing she was a valued member of Defendants for the work she performed, following up on the promise of a salary increase at 1-year, and understanding that her salary remained well below that of a similarly situated Human Resources Manager in the Colorado Springs area, which was in the range of $110,000 to $130,000 per year, Plaintiff asked that her salary be increased to be commensurate with those in her industry, experience, and area.

42.     Specifically, on February 27, 2019, Plaintiff sent an email to Ms. Banning stating that while she appreciated the opportunity to work for Defendants, she would be remiss to mention that she was not being paid at market value, compared to other similarly qualified individuals.  Plaintiff let Ms. Banning know her feelings of being undervalued for the skill set, tenure, and knowledge from approximately 20 years of human resources experience. Plaintiff let Ms. Banning know it was her intention to stay at Defendants indefinitely, but that she wanted the issue with compensation to be addressed.

43.     On March 5, 2019, Plaintiff formalized her request in a letter, supported by her research to help justify her request, to Ms. Banning, Defendants' CEO.

44.     On March 5, 2019, Ms. Banning, apparently now upset with Plaintiff for even asking for more and not apparently being grateful for what she earned, informed Plaintiff that she would not receive any further raise or salary, claiming "We don't have the money right now," "I can't pay you more than Autumn [Wulf, younger than Plaintiff, who went from Ms. Banning's executive assistant to COO] or Chris [Mensay, controller and younger than Plaintiff]," and, most offensively, "Maybe by the time you retire you will make that much."  Notably, both Chris Mensay, Ms. Wulf, and Ms. Banning were at all times younger than Plaintiff.

45.     Plaintiff expressed her disapproval and concern regarding Ms. Banning's comments, but Ms. Banning did not care and the meeting ended.

46.     Ms. Banning then targeted Plaintiff, and let her discriminatory and retaliatory light shine by subsequently going down the path of discriminating, retaliating against and ostracizing Plaintiff – culminating with Plaintiff's unlawful termination.

47.     As a slap in the face not long after the above meeting, Ms. Banning told Plaintiff she would be willing to elevate Plaintiff's title to Human Resources Director, which actually included only greater duties, but no increase in salary.

48.     While working for Defendants, Plaintiff encountered and complained about Defendants engagement in unlawful activities, which she discovered while performing her work. For instance:

- **Defendants' age discrimination**.  Ms. Banning routinely told Plaintiff that she "needed to be careful who [Plaintiff] was hiring as now [CSOG is] self-funded and we need to be sure that we aren't taking on an older population."   In Ms. Banning's opinion, older workers should be denied equal employment opportunities because she believed the pay and medical costs would be too much for CSOG.  Plaintiff routinely interviewed more-than qualified older candidates, only to be told by Ms. Banning that "they" won't be hired because "they won't be able to keep up."  Defendants' younger workers were routinely given pay increases, while older employees were not.  As an example, Defendants' age discrimination and favorable treatment of younger employees (and prospective employees) included being offered market value for their positions and/or being given numerous compensation raises: Joshua Heermans (~30 years old), Megan Erickson (~25 years old), Ms. Banning (~35 years old), Ms. Wulf (~33 years old); Sara Bolchalk (~30 years old); Hannah VanBuskirk (~30 years old); Kyrstin Cower (~25 years old); and Chevonn Fant (~25 years old).  It was routine for Ms. Banning and Ms. Wulf to perform searches on Google, Facebook, LinkedIn etc. looking specifically for the youthfulness, weight, athleticism, and physical attributes of candidates (see disability discrimination below).

- **Defendants' FMLA and disability discrimination**.  As described below, Defendants discriminated against Plaintiff for her own disabling injury, need for accommodation, and attempt to utilize FMLA for her injury.  As another example, Defendants, specifically Ms. Banning, requested Plaintiff engage in disability and FMLA discrimination/retaliation against an employee who went out on leave due to cancer, as Ms. Banning was furious when she saw that Defendants' medications cost column was higher than normal.  Ms. Banning sought information from Plaintiff as to how Defendants could try and legitimatize the termination of this employee with cancer when she did nothing wrong and had utilized FMLA.  Plaintiff refused.  Ms. Banning turned to another person to lie to this employee and tell her that her FMLA had run out when in fact this employee was eligible for a recertification under her own or following her son's death.

- **Defendants' OSHA and other non-compliance issues**.  After being asked to join Defendants' OSHA/Safety board, Plaintiff was shocked to learn of just how non-compliant Defendants were and their lackadaisical attitude towards safety. Examples included expired eye wash kits, non-complaint eye wash stations, expired fire extinguishers, and full sharps containers that were not emptied on a regular basis.  Further examples include Defendants failing to track CPR/BLS certification of its medical/support staff – and instead relying upon an honor system.  In addition, Defendants had badge scanners on the wrong side of several doors which went ignored until it had a scare at work with an ex-employee.  As a final example, Defendants also allowed some groups to drop out of mandatory fire drills because they did not want to get behind in their billing and practice. Plaintiff attempted to remedy the issues and reverse Defendants' otherwise apathetic approach to safety. Defendants were less than supportive, pushed back on and even seemed angered at Plaintiff regarding any proposed compliance change or expenditure.  Upon information and belief, Defendants are also not compliant with proper COVD-19 protocols and have been reported for their violations.

- **Defendants' 401k issues**.  Defendants were fined for upwards of $30k/incident for *inter alia* failing to pay out eligible employees going back 4 years or more. This occurred while Ms. Banning received no less than 4 salary increases in a year.  At all times, Plaintiff opposed Defendants' neglect and refusal to fix its 401k failures.  Upon information and belief, an employee of Defendants was not afforded a year's worth of retirement benefits simply because of Defendants' record-keeping and compliance short comings.

- **Defendants' wage issues**. Defendants and Ms. Banning decided to interpret Colorado's wage and hour law to their own liking, and not hold Defendants to its standards, especially in regard to meal and rest breaks.  Meal and rest breaks have never been tracked consistently, and Defendants target employees who complain about meal and/or rest breaks. As a practice, Defendants allowed employees to work the entire day without taking a lunch or meal break.  At all times, Plaintiff opposed Defendants' wage and hour practices.

- **Defendants' refusal to secure its records.** To ensure PCI/EMV compliance regarding patient records, Plaintiff brought to Defendants' attention the need for improved credit card processing via chip reader, and to move away from swiping. Being a medical practice, the fines associated with unauthorized disclosure of patient information, via a data breach through payment processing, could result in fines soaring from a half a million dollars to over a million dollars.  Further, Defendants' administrative offices were always left open with records and file cabinets holding medical, personnel records, benefits, social security numbers and private information that were not secured and at anyone's disposal.  Plaintiff made it clear that she believed that Defendants' record retention practices violated HIPAA.  Plaintiff's attempts to get records secured, physically or virtually, were met with opposition and frustration – as it was clear Defendants did not care and had no interest in expending its resources to protect patient records.  In addition to the mismanagement of patient records, Defendants failed to secure employee payroll and confidential information.

49.    To be sure, Plaintiff's duties as Human Resources Manager and then as the Human Resources Director (in name) included, but were not limited to overseeing and issuing employee discipline and terminations, hiring, employee relations, employee investigations, administrative investigations, developing and maintaining workplace processes including addressing safety issues, creating and maintaining ADA and FMLA policies, processing unemployment claims, auditing systems and processes, etc.  Plaintiff was at all times doing her job!

50. During Plaintiff's first year of work, Ms. Banning would feign interest in Plaintiff's discoveries and complaints, but never took any action to address them (unless such action affected someone she liked, or disliked). Ms. Banning would just give lip service to Plaintiff's complaints and tell Plaintiff to fix them, despite many of these fixes requiring corporate support and approval, which was never provided.

51. Then, during the Spring of 2019, Ms. Banning became distant, passive aggressive, and simply did not engage Plaintiff. Ms. Banning took no interest in Plaintiff or her complaints. Moving forward Ms. Banning did not even bother giving lip service to Plaintiff's complaints and objections to Defendants' discriminatory or unlawful practices. Ms. Banning would go so far as to avoid eye contact with Plaintiff, and would not include her in office functions like coffee runs, lunches, etc. Ms. Banning decided to exclude Plaintiff from upper level management and partner meetings.

52. As the Human Resources Director, Plaintiff pushed-back (as she always had) on Ms. Banning's requests to have Plaintiff engage in unlawful behavior concerning discipline and termination of other Defendants' employees. Notably, while Ms. Banning's improper demands were not new, her reaction to and displeasure with Plaintiff's normal push-back was. Ms. Banning became short, disgusted, or otherwise frustrated any time Plaintiff brought up Defendants' unlawful actions described above and below.

53. Continuing through Plaintiff's termination, Defendants' employment discrimination in the form of actual or perceived disability and/or age could occur in any number of situations, including: refusing to hire employees; stating or suggesting preferred candidates in a job advertisement; excluding potential employees during recruitment; denying certain

employees compensation or benefits; paying equally-qualified employees in the same position different salaries; and when issuing promotions or terminations.

54.     At all times, and especially in response to Ms. Banning's statements above, Plaintiff opposed Defendants' discriminatory hiring and employment practices.

55.     In the last few months of Plaintiff's employment, Defendants' and especially Ms. Banning's, tolerance for Plaintiff's complaints went away, and Plaintiff was on the receiving end of Defendants' unjustified critiques and scrutiny concerning the performance of her job.

56.     Unfortunately, in the last month of her employment, Plaintiff severely injured her leg, which was apparent by her boot cast, time off for medical treatment, and need to utilize a scooter around the office.

57.     Plaintiff had to deal with Defendants' negative reaction to such injury (and likely increase in medical expense, cost, and time off) and was subjected to ridicule by employees, including and especially Ms. Banning who questioned Plaintiff's ability to work, demanded information about how much time off Plaintiff would need (as Plaintiff was being evaluated for surgery), and ultimately did not tolerate Plaintiff's injury and accommodation, and potential accommodation.  Plaintiff discussed with Ms. Banning the likely need for accommodation, which necessarily included leave from work on FMLA or other form of accommodation depending on the need for and outcome of surgery.  Ms. Banning was furious and expressed her opposition to Plaintiff having to take any time off work.

58.     On August 23, 2019, Plaintiff issued an administrative employee (herein "DW"), a "collection's specialist," a first written warning for *inter alia* that employee's absenteeism, tardiness, and poor job performance. DW was admonished for using "foul language and makes

inappropriate comments and slurs in the workplace. [DW] has had two prior warnings in 2018…" amongst other issues noted in the narrative provided by Plaintiff.

59.     On August 23, 2019, Ms. Wulf emailed Plaintiff, chastising her for issuing DW a first written warning and baselessly demanding, "If any employee is going to be written up I need to be made aware of this situation."

60.     At no time prior, in literally more than a hundred write-ups and counselings, had Plaintiff ever been given a demand that she had to contact Ms. Wulf prior to disciplining Defendants' employees.

61.     In response, Plaintiff, Defendants' Human Resources Director, emailed Ms. Wulf defending her write up of DW and expressing concern about the lack of management being performed by DW's immediate supervisor and policies/procedures that needed to be revisited by Defendants out of a genuine concern for the appearance of impropriety and favoritism. She ended her email, "See you Monday!"

62.     This email was forwarded by Ms. Wulf to Ms. Banning.

63.     On Monday, August 26, 2019, Plaintiff met with Dr. Dresher (who worked for Defendants) to discuss surgery options for her leg, which would require FMLA leave and/or a form of reasonable accommodation from Defendants.

64.     After this meeting, Plaintiff was called to Ms. Banning's office, was told she was being placed on administrative leave, and that Ms. Banning would be in contact with her.  At this time, Plaintiff had her FMLA application printed out, but Ms. Banning literally beat her to the punch, as Ms. Banning – who was aware of Plaintiff's injury, need for potential surgery and/or

accommodation, and meeting with Dr. Dresher for evaluation – placed Plaintiff on a bogus administrative leave to interfere with Plaintiff's FMLA rights.

65.     According to Defendants' CCRD response, while Plaintiff was on administrative leave, Ms. Banning "personally investigated" the apparent issues raised by the write up of DW.

66.     Plaintiff was never interviewed, never learned anything about the alleged investigation, and none of this alleged investigation ever made its way into Plaintiff's personnel file or Defendants' CCRD response.

67.     Plaintiff had never been written up or otherwise placed on any other form of discipline for anything, let alone what Defendants accused her of in the CCRD response – in fact, Defendants never actually issued Plaintiff a statement, report, document, or even a termination letter stating anything of the above.

68.     On Tuesday, August 27, 2019, Defendants verbally terminated Plaintiff's employment and at the same time on their own accord, presented Plaintiff with a "Separation Agreement and Release" attempting to have Plaintiff give up all of her rights, releasing Defendants of all liability, demanding secrecy, cooperation, and non-disparagement for the sum of $18,607.50 less taxes and withholdings.

69.     In addition to her wrongful termination, Defendants –likely frustrated because of Plaintiff's refusal to sign its Separation Agreement and Release – wrongfully challenged Plaintiff's receipt of unemployment benefits, which caused her unemployment insurance (which she received) to be delayed several months, causing Plaintiff to suffer additional economic damages, emotional stress, and anxiety.

70.     As of today, Plaintiff remains unemployed and upon information and belief, Defendants have worked to blacklist Plaintiff from job prospects.

71.     Defendants replaced Plaintiff with a younger, non-disabled or perceived disabled and less expensive individual to serve and perform her job duties as Human Resources Manager/Director.

72.     Because of Defendant's above-mentioned actions, Plaintiff has suffered emotional damages.

73.     Because of Defendants' above-mentioned actions, Plaintiff has suffered economic damage as follows: the delayed payment of unemployment insurance; back wages and compensation; continued unemployment; loss of economic opportunities and professional growth; loss of insurance and benefits either not available on the open market or otherwise prohibitively expensive; and other forms of economic harm.

74.     Because of Defendants' above-mentioned actions, statutory interest has accrued on the sums of money due to Plaintiff, including back wages and compensation.

75.     Because of Defendants' above-mentioned actions, Plaintiff has been forced to retain counsel and pursue litigation, incurring costs and attorney's fees.

## VII. CLAIMS OF RELIEF

### FIRST CAUSE OF ACTION
### ADEA 29 U.S.C. § 621, *et seq.* – Age Discrimination and Retaliation
### Against All Defendants

76.     Plaintiff incorporates by reference the above-mentioned paragraphs as if fully restated and realleged herein.

77.     At all relevant times, Defendants qualified as employers and Plaintiff qualified as Defendants' employee under the ADEA.

78.     At the time of her termination, Plaintiff was 41 years old.

79.     Throughout her employment with Defendants, Plaintiff advocated the interviewing, hiring, and retention of individuals over the age of 40 years old.

80.     At all relevant times, and as alleged above, Plaintiff performed her duties satisfactorily.

81.     As alleged above, Defendants terminated Plaintiff's employment on August 27, 2019.

82.     As alleged above, in the months and year prior to Plaintiff's termination of employment, Plaintiff observed and opposed Defendants routinely and in no unclear terms expressing preference for hiring younger, less experienced, less perceived-injury/ailment prone, and less costly employees, including from the benefits perspective (e.g. health insurance).

83.     As alleged above, in the months and year prior to Plaintiff's termination of employment, Plaintiff observed and opposed Defendants' disdain, dislike, and discriminatory attitude towards older applicants and employees.

84.     At all relevant times, Plaintiff opposed Defendants' discriminatory attitude and actions against older individuals and employees.

85.     In the months and year prior to Plaintiff's termination of employment, Plaintiff observed and opposed Defendants clear preference for hiring and retaining younger individuals in its workforce.

86.     As alleged above, Defendants filled Plaintiff's position with a younger, less-qualified, less-experienced, and lower paid worker.

87.     Defendants violated the ADEA when they unlawfully terminated Plaintiff's employment because of her age (using performance as pretext) and replaced her with a younger, less-qualified, less-experienced, and lower paid worker.

88.     Defendants violated the ADEA when they unlawfully retaliated against Plaintiff's for rejecting Defendants' age-discrimination practices and calling Defendants out for engaging in such age-discrimination practices, specifically Defendants' recruitment, hiring, and retention of younger, less-qualified, less-experienced, and lower paid workers, as opposed to recruitment, hiring and retention of older, more experienced, greater paid employees.

89.     At all relevant times and as alleged above Defendants acted maliciously and willfully as they knew their conduct was prohibited by the law and/or Defendants showed a reckless disregard for whether their actions were prohibited under the law.

90.     As a direct and proximate result of Defendants' unlawful actions Plaintiff has suffered and will continue to suffer emotional distress as well as economic losses in an amount to be proved at trial.

91.     Wherefore, Plaintiff respectfully requests relief as presented at the conclusion of this pleading.

### SECOND CLAIM OF RELIEF
### ADA/ADAAA 42 U.S.C. § 12112(b)(5)(A) - Disability Discrimination
### Against All Defendants

92.     Plaintiff incorporates by reference the above-mentioned paragraphs as if fully restated and realleged herein.

93.     At all relevant times, Defendants qualified as Plaintiff's employers and Plaintiff qualified as Defendants' employee under the ADA and the ADAAA.

94.     At all relevant times, upon information and belief Defendants employed over 50 employees.

95.     In the last month of her employment, Plaintiff suffered a serious leg injury requiring her to take off work to attend medical visits and examinations, as well as seek opinion on whether she would require surgery, which would cause her to take medical leave from work.

96.     Defendants violated the ADA and the ADAAA when they, *inter alia,* unlawfully terminated Plaintiff's employment and/or failed to accommodate her actual and/or perceived disability by refusing to allow Plaintiff to seek or take leave to treat her actual and/or perceived disability.

97.     At all relevant times, Plaintiff had disabilities, which constituted an actual or perceived disability or medical condition that substantially limited her in one or more of her major life activities, including, but not limited to eating, sleeping, thinking and concentrating and working.

98.     At all relevant times, Plaintiff was a qualified individual with a disability as she satisfied the requisite skill, experience, education and other job-related requirements of the position of Human Resources Manager/Director and she could perform the essential functions of her position.

99.     Beginning in the summer of 2019, Plaintiff reasonably requested PTO so as to attend needed medical appointments.  Plaintiff's disabilities, including her medical treatment,

constituted physical or mental impairments that substantially limited her in one or more of her major life activities, including working.

100.    At all relevant times, a record existed of Plaintiff's impairments, namely the need for time off from work, which Plaintiff took in order to seek medical treatment.

101.    At all relevant times, Plaintiff was disabled or Defendants perceived or otherwise regarded Plaintiff as being disabled.

102.    Plaintiff took PTO for her medical treatment for her medical issue.

103.    On August 27, 2019, Defendants terminated Plaintiff's employment on the same day she saw Defendants' physicians for her leg and knowing that she would need to take PTO for further medical treatment, including potentially surgery.

104.    Plaintiff provided Defendants with sufficient information that, under the circumstances, they are deemed to have known about Plaintiff's actual and/or perceived disability and her desire for accommodation.

105.    The accommodations Plaintiff requested were reasonable.

106.    The accommodations Plaintiff requested posed no undue hardship to Defendants.

107.    At all relevant times and as alleged above, Defendants acted maliciously and willfully as they knew their conduct was prohibited by the law and/or Defendants showed a reckless disregard for whether their actions were prohibited under the law or not.

108.    As a direct and proximate result of Defendants' unlawful termination and/or failure to accommodate Plaintiff's actual and/or perceived disabilities, Plaintiff has suffered and will continue to suffer emotional distress as well as economic losses in an amount to be proven at trial.

109.     Wherefore, Plaintiff respectfully requests relief as presented at the conclusion of this pleading.

### THIRD CLAIM FOR RELIEF
### CADA C.R.S. § 24-34-402(1)(a) – Age Discrimination and Retaliation
### Against All Defendants

110.     Plaintiff incorporates by reference the above-mentioned paragraphs as if fully restated and realleged herein.

111.     At all relevant times, Defendants qualified as employers and Plaintiff qualified as Defendants' employee under the CADA.

112.     At the time of her termination, Plaintiff was 41 years old.

113.     Throughout her employment with Defendants, Plaintiff advocated the interviewing, hiring, and retention of individuals over the age of 40 years old.

114.     At all relevant times, and as alleged above, Plaintiff performed her duties satisfactorily.

115.     As alleged above, Defendants terminated Plaintiff's employment on August 27, 2019.

116.     As alleged above, in the months and year prior to Plaintiff's termination of employment, Plaintiff observed Defendants routinely and in no unclear terms expressing preference for hiring younger, less experienced, and less costly employees, including from the benefits perspective (e.g. health insurance).

117.     As alleged above, in the months and year prior to Plaintiff's termination of employment, Plaintiff observed Defendants express a disdain, dislike, and discriminatory attitude towards older applicants and employees.

23

118.     At all relevant times, Plaintiff opposed Defendants' discriminatory attitude and actions against older individuals and employees.

119.     In the months and year prior to Plaintiff's termination of employment, Plaintiff observed Defendants clear preference for hiring and retaining younger individuals in its workforce.

120.     As alleged above, Defendants filled Plaintiff's position with a younger, less-qualified, less-experienced, and lower paid worker.

121.     Defendants violated the CADA when they unlawfully terminated Plaintiff's employment because of her age (using performance as pretext) and replaced her with a younger, less-qualified, less-experienced, and lower paid worker.

122.     Defendants violated the CADA when they unlawfully retaliated against Plaintiff's for rejecting Defendants' age-discrimination practices and calling Defendants out for engaging in such age-discrimination practices, specifically Defendants' recruitment, hiring, and retention of younger, less-qualified, less-experienced, and lower paid workers, as opposed to recruitment, hiring and retention of older, more experienced, greater paid employees.

123.     At all relevant times and as alleged above Defendants acted maliciously and willfully as they knew their conduct was prohibited by the law and/or Defendants showed a reckless disregard for whether their actions were prohibited under the law.

124.     As a direct and proximate result of Defendants' unlawful actions Plaintiff has suffered and will continue to suffer emotional distress as well as economic losses in an amount to be proved at trial.

125.     Wherefore, Plaintiff respectfully requests relief as presented at the conclusion of this pleading.

## FOURTH CLAIM FOR RELIEF
### CADA C.R.S. § 24-34-402(1)(a) - Disability Discrimination
### Against All Defendants

126.     Plaintiff incorporates by reference the above-mentioned paragraphs as if fully restated and realleged herein.

127.     At all relevant times, Defendants, jointly and/or individually, qualified as employers and Plaintiff qualified as Defendants' employee under the CADA At all relevant times, upon information and belief Defendants employed over 50 employees.

128.     In the last month of her employment, Plaintiff suffered a serious leg injury requiring her to take off work to attend medical visits and examinations, as well as seek opinion on whether she would require surgery, which would cause her to take medical leave from work.

129.     Defendants violated the CADA when they, *inter alia,* unlawfully terminated Plaintiff's employment and/or failed to accommodate her actual and/or perceived disability by refusing to allow Plaintiff to seek or take leave to treat her actual and/or perceived disability.

130.     At all relevant times, Plaintiff had disabilities, which constituted an actual or perceived disability or medical condition that substantially limited her in one or more of her major life activities, including, but not limited to eating, sleeping, thinking and concentrating and working.

131.     At all relevant times, Plaintiff was a qualified individual with a disability as she satisfied the requisite skill, experience, education and other job-related requirements of the

position of Human Resources Manager/Director and she could perform the essential functions of her position.

132.    Beginning in the summer of 2019, Plaintiff reasonably requested PTO so as to attend needed medical appointments.  Plaintiff's disabilities, including her medical treatment, constituted physical or mental impairments that substantially limited her in one or more of her major life activities, including working.

133.    At all relevant times, a record existed of Plaintiff's impairments, namely the need for time off from work, which Plaintiff took in order to seek medical treatment.

134.    At all relevant times, Plaintiff was disabled or Defendants perceived or otherwise regarded Plaintiff as being disabled.

135.    Plaintiff took PTO for medical treatment for her medical issue.

136.    On August 27, 2019, Defendants terminated Plaintiff's employment on the same day she saw Defendants' physicians for her leg and knowing that she would need to take PTO for further medical treatment, including potentially surgery.

137.    Plaintiff provided Defendants with sufficient information that, under the circumstances, they are deemed to have known about Plaintiff's actual and/or perceived disability and her desire for accommodation.

138.    The accommodations Plaintiff requested were reasonable.

139.    The accommodations Plaintiff requested posed no undue hardship to Defendants.

140.    At all relevant times and as alleged above, Defendants acted maliciously and willfully as they knew their conduct was prohibited by the law and/or Defendants showed a reckless disregard for whether their actions were prohibited under the law or not.

141.    As a direct and proximate result of Defendants' unlawful termination and/or failure to accommodate Plaintiff's actual and/or perceived disabilities, Plaintiff has suffered and will continue to suffer emotional distress as well as economic losses in an amount to be proven at trial.

142.    Wherefore, Plaintiff respectfully requests relief as presented at the conclusion of this pleading.

## FIFTH CLAIM OF RELIEF
### FMLA 29 U.S.C. § 2601, *et seq.* – Discrimination, Retaliation, Interference, and/or Failure to Notify
### Against All Defendants

143.    Plaintiff incorporates by reference the above-mentioned paragraphs as if fully restated and realleged herein.

144.    At all relevant times, Defendants qualified as Plaintiff's employer and Plaintiff qualified as Defendant's employee under FMLA, given that Defendants had 50 or more employees.

145.    Plaintiff worked for Defendants for over one year and worked in excess of 1250 hours in the 12 months prior to her need for leave.

146.    Plaintiff suffered from a serious medical condition, namely a serious injury to her leg which required Plaintiff to take leave for treatment and recovery, and was working with her doctor to determine whether or not surgery was required on her leg.

147.    Plaintiff was entitled to medical leave for the care and treatment of her own serious medical condition.

148.   At all relevant times Defendants were on notice of Plaintiff's need for FMLA leave.

149.   Defendants were required to provide Plaintiff with an appropriate FMLA eligibility notice and opportunity to complete and submit said notice.

150.   Defendants were required to provide Plaintiff with an appropriate FMLA rights and responsibilities notice and allow her an opportunity to submit said notice.

151.   Defendants were required to provide Plaintiff with an appropriate FMLA designation notice.

152.   Defendants failed to comply with the FMLA Employer Notice Requirements contained in 29 C.F.R. § 825.300 by failing to provide Plaintiff an eligibility notice, a rights and responsibilities notice, and a designation notice.

153.   29 C.F.R. § 825.300(e) states that a, "Failure to follow the notice requirements set forth in this section may constitute an interference with, restraint, or denial of the exercise of an employee's FMLA rights."

154.   29 U.S.C. § 2615(a)(1) makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA.

155.   By failing to follow the FMLA Employer Notice Requirements Defendants interfered with, restrained, or otherwise denied Plaintiff the exercise of her FMLA rights.

156.   Defendants' failure to comply with the FMLA Employer Notice Requirements caused the termination of Plaintiff's employment by not providing her the notice or information necessary to determine that his absences from work would or would not be counted as FMLA leave.

157.    Plaintiff was entitled to reinstatement to her prior position or a substantially equivalent position at the conclusion of her FMLA leave; instead, rather than allow Plaintiff to receive proper notification and avail herself of FMLA, Defendants terminated Plaintiff's employment.

158.    Unfortunately, in the last month of her employment, Plaintiff severely injured her leg, which was apparent by her boot cast, time off for medical treatment, and need to utilize a scooter around the office.

159.    Plaintiff had to deal with Defendants' negative reaction to such injury (and likely increase in medical expense, cost, and time off) and was subjected to ridicule by employees, including and especially Ms. Banning who questioned Plaintiff's ability to work, demanded information about how much time off Plaintiff would need (as Plaintiff was being evaluated for surgery), and ultimately did not tolerate Plaintiff's injury and accommodation, and potential accommodation.  Plaintiff discussed with Ms. Banning the likely need for accommodation, which necessarily included leave from work on FMLA or other form of accommodation depending on the need for and outcome of surgery.  Ms. Banning was furious and expressed her opposition to Plaintiff having to take any time off work.

160.    During the same time that Plaintiff was attempting to avail herself of FMLA leave, Ms. Banning and Defendants subjected Plaintiff to the above ridicule and discrimination.

161.    At all relevant times Ms. Banning appeared to target Plaintiff, treating her differently, more negatively, and more critically than other employees who were not injured or seeking to exercise their FMLA rights.

162.    29 U.S.C. § 2615(a)(1) makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA.

163.    Defendants' actions and omissions violated Plaintiff's rights under 29 U.S.C. § 2615(a).

164.    Defendants discriminated, retaliated, interfered with, restrained, or otherwise denied Plaintiff the exercise of her FMLA rights.

165.    Defendants' FMLA discrimination, retaliation, interference and failure to comply with the FMLA Employer Notice Requirements adversely impacted Plaintiff and her employment with Defendants.

166.    Defendants' actions and omissions violated Plaintiff's rights under the FMLA, which require notice and prohibit discrimination, retaliation, and interference.

167.    As alleged above, Defendants caused, allowed, and/or condoned Plaintiff's rights under the FMLA to be violated.

168.    At all relevant times and as alleged above, Defendants acted maliciously and willfully as they knew their conduct was prohibited by the law and/or Defendants showed a reckless disregard for whether their actions were prohibited under the law or not.

169.    As a direct and proximate result of Defendants' unlawful termination and/or failure to provide FMLA notices and/or interference with Plaintiff's ability to avail herself of FMLA protections and other above-mentioned acts, Plaintiff has suffered and will continue to suffer emotional distress as well as economic losses in an amount to be proven at trial.

170.    Wherefore, Plaintiff respectfully requests relief as presented at the conclusion of this pleading.

WHEREFORE, Plaintiff prays for the following relief:

A.    Orders and judgments as requested;
B.    Nominal damages;
C.    Economic and compensatory damages, in an amount to be shown at trial;
D.    Consequential damages;
E.    Liquidated damages;
F.    Punitive or exemplary damages, in an amount to be shown at trial;
G.    Statutory penalties for failure to pay wages;
H.    Statutory penalties for a willful failure to pay wages;
I.    Costs and attorney's fees;
J.    Pre- and post-judgment interest at the highest rate allowed by law;
K.    All legal or equitable relief; and
L.    All other legal or equitable relief to which Plaintiff is entitled and/or the court and/or jury deems just and proper.

**<u>PLAINTIFF REQUESTS A TRIAL BY JURY ON ALL ISSUES TRIABLE TO A JURY.</u>**

Respectfully submitted this 17th day of September 2020.


*s/Christopher G. Wilhelmi*
Christopher G. Wilhelmi
Attorney for Plaintiff

Stinar &Zendejas PLLC
121 East Vermijo Ave, Suite 200
Colorado Springs, CO 80903
E-mail: chris@coloradolawgroup.com
Fax: 719-635-2493

31